JESUS A. OSETE, Acting Assistant Attorney General (MOBN 69267)
R. JONAS GEISSLER, Deputy Assistant Attorney General (NJBN 025752001)
LUIS PEREZ, Director (DCBN 1742934)
KEVIN J. KIJEWSKI, Deputy Chief (IL ARDC 6226876)
KATHERINE DUTCHER, Trial Attorney (CABN 313010)
JANE E. ANDERSEN, Trial Attorney (NYRN 4651519)
DAVID W. KNIGHT, Trial Attorney (MDAN 0412140410)
JAMES FLETCHER, Trial Attorney (MDAN 1412160273)
U.S. Department of Justice
950 Pennsylvania Ave., N.W.- 4CON
Washington, DC 20530
Telephone: (202) 353-5553
katherine.dutcher@usdoj.gov

CRAIG H. MISSAKIAN, United States Attorney (CABN 125202)
KENNETH BRAKEBILL, Chief, Civil Division (CABN 196696)
SAVITH IYENGAR, Assistant United States Attorney (CABN 268342)
Phillip Burton Federal Building
450 Golden Gate Avenue
Telephone: (415) 436-7200
savith.iyengar@usdoj.gov

*Attorneys for Plaintiff United States of America*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

Plaintiff,

v.

LYFT, INC.

Defendant.

CASE NO. 3:26-cv-13454

**COMPLAINT**

DEMAND FOR JURY TRIAL

## I. INTRODUCTION

1. Plaintiff United States of America brings this action to enforce Title III of the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37, against Defendant Lyft, Inc. (Defendant or Lyft).

2. The ADA prohibits private transportation companies from discriminating against people with disabilities. Lyft is a provider of demand-responsive[1] transportation in the United States. Lyft has

[1] "Demand responsive" transportation is any system of providing transportation by vehicle that is

partnered with local governments to provide publicly funded paratransit services for passengers with disabilities.

3. Lyft contracts with health care providers and insurance companies to provide transportation services to its customers.

4. Many individuals with disabilities rely on Lyft's services to meet their transportation needs—including to travel to work, medical appointments, religious services, and other important places.

5. Despite the importance of its transportation services to people with disabilities, Lyft denies people with disabilities full and equal enjoyment of its services in several critical ways.

6. Lyft and its drivers routinely refuse to serve individuals with disabilities, including individuals who travel with service animals or who use stowable wheelchairs.

7. Lyft also imposes impermissible surcharges by charging fees such as cancellation fees to riders they have unlawfully denied service.

8. Lyft's drivers insult and demean people with disabilities and its customer service representatives ask them disrespectful questions.

9. Lyft refuses to reasonably modify its policies, practices, or procedures where necessary to avoid discriminating against riders with disabilities. Its drivers refuse reasonable requests such as letting passengers with mobility impairments sit in the front seat when necessary.

10. Lyft has the obligation and ability to ensure that its drivers do not discriminate against riders with disabilities.

11. Lyft is aware of, but fails to prevent and remedy, disability-based discrimination throughout its transportation services. Lyft does not adequately train its drivers and customer service representatives about their ADA obligations; monitor its drivers to prevent discrimination; or provide meaningful relief to people it has discriminated against.

12. After the Department notified Lyft of its investigation into complaints of widespread disability-based discrimination, Lyft instituted a voluntary opt-in feature that allows riders to disclose to

---

not "a fixed route system," 42 U.S.C. § 12181(3), and includes services that involve calling for a car and a driver to take one places, *see* 49 C.F.R. pt. 37, app. D § 37.29.

a driver that they will be traveling with a service animal. Despite this measure, Lyft has continued to discriminate against riders who use service animals.

13. Lyft's discriminatory conduct has caused significant harm to individuals with disabilities.

14. The United States brings this action based on a reasonable-cause determination that a person or group of persons has been discriminated against, and that Lyft's discrimination raises an issue of general public importance. 42 U.S.C. § 12188(b)(1)(B)(ii).

15. The United States also brings this action based on a reasonable-cause determination that Lyft has engaged in a pattern or practice of discrimination against people with disabilities. 42 U.S.C. § 12188(b)(1)(B)(i).

16. To redress violations of the ADA by Lyft, the harm Lyft has caused, and to prevent Lyft from continuing to discriminate against people with disabilities, the United States seeks declaratory and injunctive relief, monetary damages, and a civil penalty.

## II. STATUTORY AND REGULATORY BACKGROUND

17. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).

18. In passing the ADA, Congress explained that "the Nation's proper goals" include providing people with disabilities "equality of opportunity, full participation, independent living, and economic self-sufficiency" in all aspects of American society. *Id.* § 12101(a)(7).

19. Congress also found that "individuals with disabilities continually encounter various forms of discrimination" in "critical areas" including "transportation." *Id.* § 12101(a)(3) and (5).

20. The ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of specified public transportation services provided by a private entity that is primarily engaged in the business of transporting people and whose operations affect commerce." *Id.* § 12184(a); *see also* 49 C.F.R. § 37.5.

21. The ADA requires private entities, including Lyft, to comply with specific obligations when providing transportation services to individuals with disabilities, by:

(a) Providing individuals with disabilities the opportunity to use the entity's transportation service, if they are capable of using that service, 49 C.F.R. §§ 37.5(b), 37.29(c); *see also* 42 U.S.C. § 12184(b)(1), (2);

(b) Permitting service animals to accompany individuals with disabilities in vehicles, 49 C.F.R. § 37.167(d); *see also* 42 U.S.C. § 12184(a);

(c) Providing equal service to individuals with disabilities, including assistance with stowing mobility devices when needed, 49 C.F.R. § 37.29(c); *see also* 42 U.S.C. § 12184(a);

(d) Not imposing surcharges or other disability-related charges on passengers with disabilities, 49 C.F.R. §§ 37.5(d), 37.29(c); *see also* 42 U.S.C. § 12184(a) and 28 C.F.R. § 36.301(c) (incorporated by 49 C.F.R. § 37.5(f));

(e) Ensuring that personnel are trained to proficiency, as appropriate to their duties, so that they can properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, 49 C.F.R. § 37.173; *see also* 42 U.S.C. § 12184(a);

(f) Adopting complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complainant, 49 C.F.R. § 37.17(b); *see also* 42 U.S.C. § 12184(a); and

(g) Reasonably modifying policies, practices, or procedures when necessary to avoid discriminating against individuals with disabilities unless an entity can show that making such modifications would fundamentally alter the nature of its transportation services, 42 U.S.C. § 12184(b)(2)(A); 49 C.F.R. § 37.5(f); *see also* 42 U.S.C. § 12184(a) and 28 C.F.R. § 36.302 (incorporated by reference in 49 C.F.R. § 37.5(f)).

## III. PARTIES

22. Plaintiff is the United States of America.

23. Defendant Lyft is a Delaware corporation with its principal place of business at 185 Berry Street, Suite 400, San Francisco, California, 94107. Lyft is a for-profit company that provides public transportation services in all 50 states in the United States, and in Puerto Rico and Washington, D.C.

24. Lyft refers to Lyft, Inc. and any of its subsidiary companies or operationally distinct segments that are responsible for Lyft's provision of transportation services. *See* 49 C.F.R. § 37.37(f) (nondiscrimination requirements apply to the transportation service provided by "a subsidiary company or an operationally distinct segment of [a parent private company]" if that subsidiary or operationally distinct segment "is primarily engaged in the business of transporting people").

25. Lyft provides "specified public transportation services," which the ADA defines as "transportation by . . . any [] conveyance (other than by aircraft) that provides the general public with general or special service (including charter service) on a regular and continuing basis." 42 U.S.C. § 12181(10); *see also* 49 C.F.R. § 37.3.

26. Lyft is a private entity primarily engaged in the business of transporting people, and its operations affect commerce. *See* 42 U.S.C. §§ 12181(1), (6), 12184(a) and 49 C.F.R. § 37.3.

27. Lyft is a private entity that provides taxi services, i.e., transportation services that involve calling for a car and a driver to take one places. *See* 49 C.F.R. § 37.29; *see also id.* pt. 37, app. D § 37.29.

## IV. JURISDICTION, VENUE, AND DIVISIONAL ASSIGNMENT

28. This Court has jurisdiction over this action under the ADA, 42 U.S.C. § 12188(b)(1)(B) and 28 U.S.C. §§ 1331 and 1345, because it involves claims arising under federal law and is commenced by the United States.

29. The Court may grant declaratory relief and other necessary or proper relief pursuant to 28 U.S.C. §§ 2201 and 2202, and may grant equitable relief, monetary damages, and a civil penalty pursuant to 42 U.S.C. § 12188(b)(2).

30. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the United States' claims occurred in this district and because Lyft resides in this district.

31. Divisional assignment to the San Francisco or Oakland Division is proper under Civil L.R. 3-2(c) because Lyft is headquartered in San Francisco, and a substantial part of the events or omissions that give rise to the claims occurred in San Francisco.

## V. FACTUAL ALLEGATIONS

32. Lyft provides demand-responsive transportation services, meaning passengers request a car and driver to take them places using Lyft's mobile software application (app) and Lyft arranges rides between passengers and a fleet of drivers approved by Lyft.

33. Lyft operates a transportation system that connects drivers with riders.

34. Lyft determines what towns, cities, and regions in which it operates its transportation services.

35. Lyft assesses the needs of current and potential riders and offers services based on those needs, including Standard (its basic rideshare option), Wait & Save (longer wait time at a lower price), Priority Pickup (shorter wait time), Extra Comfort (newer and cleaner cars with top-rated drivers), Black (luxury car service with top-rated drivers), Black SUV (luxury SUVs for up to six passengers with top-rated drivers), XL (SUVs for up to six passengers), and Pet (for passengers traveling with a pet; riders pay a $4 fee plus tax, which goes entirely to the driver).

36. Lyft controls each trip by setting and enforcing, among other things: vehicle specifications; driver training requirements, qualifications, and incentive programs; driver behavior expectations; location tracking; the general ride experience for each trip; and the pricing structure for each trip, including when fees may be charged for ride cancellations.

37. For example, drivers must drive a four-door vehicle while driving for Lyft.

38. To be eligible to drive for Extra Comfort, drivers must drive an eligible vehicle approved by Lyft, have completed at least 20 trips, maintain a minimum driver rating of 4.95, have no more than one safety flag in the past 20 rides, have no more than one cleanliness flag in the past 100 rides, and have no more than one service flag in the past 100 rides. Upon information and belief, a Lyft "flag" is a direct passenger report or automated alert indicating an issue with a driver's service quality, safety, vehicle condition, or policy compliance.

39. Lyft assesses and meets demand for its transportation services by, among other things, using algorithms to match passengers with drivers and by offering surge pricing to account for high demand.

40. Lyft's efforts to recruit drivers include helping drivers rent a vehicle they can drive for Lyft through Lyft's Express Drive program.

41. Lyft provides support to its drivers, including by telephone and in-app support.

42. Lyft limits the hours its drivers can drive before requiring them to take a break.

43. Lyft monitors rides for signs of "unusual activity," such as mid-ride cancellations or long stops.

44. Lyft maintains commercial liability insurance coverage on behalf of its drivers when driving for Lyft.

45. Lyft sets rates and fees that determine how much it will pay drivers for each trip based on estimated time and distance to complete the ride, distance to the pickup, the number of ride requests in the area, how many Lyft drivers are on the road, and how busy it is at the destination.

46. Lyft permits riders to report driver misconduct and to rate driver performance.

47. Lyft sometimes enforces its community guidelines and policies by, among other things, investigating complaints of violations and temporarily or permanently banning drivers and riders from Lyft's services when its community guidelines, policies, or the law have been violated.

48. Lyft discriminates against a person or group of persons on the basis of disability in violation of 42 U.S.C. § 12188(b)(1)(B)(ii) and 28 C.F.R. § 36.503 and such discrimination raises an issue of general public importance. *See also* 42 U.S.C. § 12101(a)(3) and (5), (b)(1).

49. Lyft is engaging in a pattern or practice of discrimination by failing to provide full and equal enjoyment of its transportation services to people with disabilities in violation of 42 U.S.C. § 12184; and 49 C.F.R. pt. 37.

50. All the individuals with disabilities whose experiences are described below, as well as all other similarly situated individuals against whom Lyft has discriminated based on disability, are aggrieved persons within the meaning of 42 U.S.C. § 12188(b)(2)(B) and 28 C.F.R. § 36.503 and have or may have suffered injuries as a result of its conduct alleged below.

**A. <u>Lyft's Denial of Service to Individuals with Disabilities</u>**

51. Lyft denies service to hundreds, and likely thousands, of individuals with disabilities who travel with service animals, or who use wheelchairs or other mobility devices.

52. Lyft receives thousands of complaints each year alleging disability-based discrimination by Lyft.

53. Lyft's discriminatory denials of service have harmed James Rath, Virginia Prince, Elizabeth Glew, David Tatel, Sharon Zenger, Jodie Simon, Mia Ives-Rublee, Cody Leal, Yvonne Chadwick, Julie Bentley, Lynette Lijewski, Patricia Ebel, and Aleeha Dudley—all people with a physical or mental impairment that substantially limits one or more major life activities, a record of such an impairment, or are regarded as having such an impairment—as well as many other similarly situated individuals with disabilities who have used Lyft's services.

**James Rath**

54. James Rath lives in Franklin, Tennessee. Mr. Rath is legally blind and uses a guide dog for navigation.

55. Mr. Rath uses Lyft for transportation, including to commute to and from work.

56. Since Mr. Rath got his guide dog in November 2025, he has experienced repeated service denials while using Lyft.

57. Mr. Rath uses Lyft's opt-in feature to notify Lyft drivers in advance that he is traveling with a guide dog. Still, Lyft drivers deny Mr. Rath service.

58. For example, in June 2026, Mr. Rath ordered a Lyft for a late-night trip home from the airport. When the Lyft driver arrived, he told Mr. Rath that he does not take dogs and drove away. Below are screenshots from a video showing Mr. Rath's guide dog standing outside the Lyft at the pickup location as Mr. Rath speaks to the Lyft driver and then while the Lyft leaves.

[continues on next page]








59. The Lyft driver, however, did not cancel the trip, preventing Mr. Rath from ordering another Lyft ride. Instead, he drove away from Mr. Rath, stranding Mr. Rath while Mr. Rath waited for the Lyft driver to cancel the trip. Below is a redacted screenshot showing messages Mr. Rath sent to the Lyft driver telling the Lyft driver to cancel the ride so Mr. Rath could request another Lyft.



60. Mr. Rath believes the Lyft driver did not cancel the trip so that Mr. Rath would have to do so, making it more difficult for Mr. Rath to complain to Lyft about the service denial.

61. Mr. Rath complained through the Lyft app's chat feature about this service denial as it was happening. Lyft did not follow up with him about his complaint until Mr. Rath posted his experience to social media three months later. Lyft gave Mr. Rath a $10 credit.

62. Mr. Rath is frustrated and exasperated by Lyft denying service to him because he has a service dog, including stranding him without transportation.

63. In part because of his on-going difficulty with Lyft, Mr. Rath is now considering bioptic lenses to regain at least partial ability to drive with a driver's license again—an expensive and time-consuming process.

**Virginia Prince**

64. Virginia Prince lives in Berkeley, California. Ms. Prince is blind and travels with a guide dog.

65. Ms. Prince uses Lyft to travel to work, medical appointments for her and her two children, and other places. Lyft frequently denies Ms. Prince rides because she travels with a guide dog.

66. For example, in October 2026 a Lyft driver denied Ms. Prince and her family service because of her guide dog after she had entered the Lyft. She refused to exit the Lyft and the Lyft driver called the police. The Lyft driver must have also canceled the ride, because a second Lyft arrived while Ms. Prince remained in the first Lyft vehicle. The second Lyft driver ended up taking Ms. Prince and her family, but told Ms. Prince that the first Lyft driver should have denied the ride before Ms. Prince got into the Lyft.

67. In September 2026, Ms. Prince requested a Lyft to pick her up from her fitness center. The Lyft driver arrived and told Ms. Prince he would not allow her dog into the car. Ms. Prince explained that her dog is not a pet but a service animal and encouraged the driver to call Lyft to confirm. The Lyft driver stated "no pet," and continued to deny her service.

68. Ms. Prince has experienced similar denials for years. For example, in May 2024 Ms. Prince requested a Lyft to take her and her child to church.

69. When the Lyft arrived, the Lyft driver refused to take Ms. Prince because of her guide dog. Ms. Prince had to argue with the Lyft driver in front of her child and explain it was a guide dog and it is against the law to refuse service to her because of it.

70. Despite this, the Lyft driver canceled Ms. Prince's ride and drove away.

71. Ms. Prince had to wait for another Lyft to take her, resulting in her being 20 to 30 minutes late for church and missing choir rehearsal.

72. In another instance, Ms. Prince ordered a Lyft to take her to a dentist appointment.

73. Two Lyft drivers in a row arrived and refused to transport Ms. Prince because of her guide dog, significantly delaying her trip.

74. When Ms. Prince finally arrived at her dentist's office, they informed her she was too late and would have to reschedule.

75. Ms. Prince has tried to avoid service denials by hiding herself and her guide dog out of sight until the Lyft arrives.

76. Ms. Prince finds Lyft's frequent discrimination very stressful and upsetting, especially when it occurs in front of her children.

77. Because of Lyft's discrimination, Ms. Prince uses Lyft less often than she did in the past.

**Elizabeth Glew**

78. Elizabeth Glew lives in Lansing, Michigan. Ms. Glew has had two traumatic brain injuries, resulting in impairments that substantially limit major life activities, including cognitive function, walking, and balance.

79. Ms. Glew uses a service dog trained to perform several tasks that assist her with her disabilities, including helping her with her mobility and balance, picking up objects off the ground, and providing pressure therapy.

80. In April 2023, Ms. Glew requested a Lyft while visiting Roseville, Minnesota.

81. When the Lyft driver arrived, he told Ms. Glew that he would not allow her to ride with her service dog.

82. When Ms. Glew attempted to explain that her service dog is medical equipment and not a pet, the Lyft driver talked over her and insisted that Ms. Glew had to notify him in advance if a service dog would be present.

83. Ms. Glew tried to explain to the Lyft driver that he was wrong, but he continued to repeat himself and refused to provide her service.

84. Ms. Glew called the Advocates for Service Animal Partners (ASAP), and the president of ASAP offered to speak to the Lyft driver. Ms. Glew hoped that the Lyft driver might listen to the president of ASAP, but the Lyft driver continued to refuse her service and told her she needed to exit the vehicle because he had another passenger to pick up.

85. After Lyft denied Ms. Glew a ride because of her service dog, her sister had to leave work early and drive across town to pick her up.

86. Ms. Glew attempted to file a complaint with Lyft through its app but could not do so.

87. ASAP provided Ms. Glew with a phone number for Lyft's customer service.

88. Ms. Glew called Lyft to make a complaint, and Lyft emailed her promising Lyft would investigate and would follow up with her at the conclusion of the investigation.

89. When she had not heard back from Lyft three weeks later, Ms. Glew emailed Lyft to ask about the status of her complaint and never received a response.

90. Ms. Glew was upset and shaken by the experience and did not regain her composure for a long time.

91. Ms. Glew deleted the Lyft app after this incident because she did not want to use Lyft again. Ms. Glew had heard from other service animal handlers about similar experiences and has little confidence in Lyft.

92. Since that time, she has only used Lyft one time because there was no other good option.

93. Not having Lyft as a viable option is a burden for Ms. Glew.

94. For example, in September 2026 Ms. Glew had a dentist appointment but lacked access to her car. Ms. Glew would have used Lyft but for the likelihood of being denied a ride because of her service dog.

95. Ms. Glew instead chose to use her city's paratransit service, which is not as efficient as using Lyft. The paratransit ride took about one hour from her home to the dentist's office, even though her dentist's office is only about 5 miles away. Using Lyft would have been much shorter, less stressful, and more convenient.

**David Tatel**

96. The Honorable David S. Tatel lives in Washington, D.C. Judge Tatel is blind and uses a guide dog.

97. In April 2023, Judge Tatel and his wife requested a Lyft to pick them up from their synagogue and drive them home.

98. When Judge Tatel and his guide dog entered the car, the Lyft driver began to scream at Judge Tatel to get out because of his guide dog. The Lyft driver exited the car and continued to yell at Judge Tatel and began to yell at his wife as well.

99. Judge Tatel explained to the Lyft driver that the dog is a trained service animal and that the Lyft driver has a legal obligation to take him, but the Lyft driver continued to yell and refuse Judge Tatel service.

100. Judge Tatel found this to be the most insulting and demeaning experience he had had with his guide dog. He and his wife were shaken by the experience.

101. Judge Tatel filed a complaint with Lyft. Lyft gave him a $10 credit, but he wanted Lyft to improve its procedures instead.

102. As a result of this experience, Judge Tatel is deterred from using Lyft's services and instead typically relies on more expensive transportation options to avoid discrimination.

103. Despite that reticence, however, in September 2026, Judge Tatel and his wife attempted to use Lyft. When the Lyft driver arrived and could see Judge Tatel and his guide dog, the driver locked the doors preventing them from opening the door.

104. Judge Tatel's wife told the driver through the rolled-down passenger-side window that the law requires him to take them, but the Lyft driver said "no" and drove away.

105. Judge Tatel filed a complaint with Lyft, where Lyft responded with a form response and provided a $10 credit, which Judge Tatel found insulting.

106. Judge Tatel wrote back to Lyft stating that he wanted to know what happened to the Lyft driver and whether the Lyft driver has been deactivated on the Lyft platform. Lyft refused to tell Judge Tatel what actions, if any, Lyft took with respect to the Lyft driver, citing the Lyft driver's privacy rights. Judge Tatel found this response to be insulting.

**Sharon Zenger**

107. Sharon Zenger lives in Vancouver, Washington. Ms. Zenger is deaf-blind and uses a guide dog for navigation.

108. Ms. Zenger works as a teacher and orientation and mobility instructor for blind and visually impaired students.

109. As part of her job, she uses Lyft to travel to different schools as often as four to ten times each day.

110. Ms. Zenger now uses Lyft's opt-in feature and sends an additional customized message to Lyft drivers through the app to notify them, among other things, that she is deaf-blind and uses a guide dog.

111. Despite this, Ms. Zenger continues to experience frequent service denials even when using Lyft's opt-in feature.

112. Upon learning that Ms. Zenger has a guide dog, Lyft's drivers frequently refuse to give Ms. Zenger a ride. Ms. Zenger can see five to six feet in front of her, as well as shadows, so she can see the Lyft driver arrive at the pickup location, slow down, and then drive away.

113. In June 2026, Ms. Zenger requested a Lyft to travel to a work meeting. Below is a redacted screenshot of messages Ms. Zenger sent to the Lyft driver through the Lyft app notifying him that she has a guide dog.

[continues on next page]




114. When the Lyft driver arrived, he repeatedly said, "no dog," and locked his doors.

115. Ms. Zenger informed the Lyft driver of Lyft's policy regarding service animals. The Lyft driver repeated, "no dog."

116. Ms. Zenger then asked the Lyft driver to cancel the ride so Lyft would not charge her for being a "no show."

117. Instead, the Lyft driver drove a short distance away and waited on the side of the road without canceling the ride. Below are redacted screenshots from the Lyft app showing the Lyft driver stopped for several minutes a short distance away from Ms. Zenger's pickup location.

[continues on next page]







118. Lyft charged Ms. Zenger a cancellation fee for being a “no show.” To obtain a refund from Lyft, Ms. Zenger had to file a complaint where she submitted video of the incident.

119. Ms. Zenger was late to her meeting even though she had budgeted extra travel time to account for a possible service denial.

120. In December 2024, Ms. Zenger requested a Lyft to pick her up at a middle school. The Lyft driver arrived at the location where Ms. Zenger was waiting with her guide dog but did not call out her name as requested as a reasonable modification for her disability. Ms. Zenger called the Lyft driver and could hear the driver’s phone ring through the vehicle’s audio. As she walked toward the sound, Ms. Zenger heard the car pull away.

121. Ms. Zenger filed a complaint with Lyft about the ride denial, and Lyft credited Ms. Zenger’s account with $10.

122. Lyft drivers’ frequent cancellations interfere with Ms. Zenger’s ability to do her job, which requires her to travel to schools to provide services to students with disabilities. Ms. Zenger has also been late to work because of Lyft’s ride denials.

123. Lyft’s drivers deny Ms. Zenger service so often that she generally no longer bothers filing complaints with Lyft.

124. Lyft once notified Ms. Zenger that her behavior with a Lyft driver was inappropriate and that her account would be deactivated. Ms. Zenger believes this is because she advocated for herself with the Lyft driver and asserted her rights.

125. Lyft's service denials make Ms. Zenger feel like "less of a citizen" and have placed significant stress on her as she tries to excel at her job, for which she relies on Lyft for transportation.

**Jodie Simon**

126. Jodie Simon lives in Valmy, Nevada. Ms. Simon has mobility disabilities due to injuries sustained in a near fatal car accident in December 2023. Following her accident, her disabilities substantially limited major life activities, including walking and balance.

127. After her accident, Ms. Simon used a wheelchair or a walker.

128. In May 2024, Ms. Simon arranged a Lyft through her insurer to take her home following a dentist appointment in Sacramento, California. Ms. Simon waited for the Lyft in her wheelchair outside the dentist's office.

129. As described below, multiple Lyft drivers in a row denied her service because of her wheelchair.

130. One Lyft arrived and parked nearby. The Lyft driver then drove away as Ms. Simon was waving at him.

131. Another Lyft arrived and the Lyft driver refused to provide assistance with stowing her wheelchair and drove off.

132. Because of Lyft's service denials, Ms. Simon waited for a long time outside since the dentist's office was on a hillside and she could not wheel herself back up the hill.

133. Due to certain medications Ms. Simon was taking, her skin was sensitive to sunlight, and she became sunburned.

134. Lyft's service denials also delayed Ms. Simon in taking her pain medications, which increased her pain.

135. Lyft's service denials caused Ms. Simon stress and anxiety. She was already struggling with losing her independence due to her disability, and Lyft's ride denials made her want to avoid going out so she would not have another similar experience.

**Mia Ives-Rublee**

136. Mia Ives-Rublee currently lives in Stony Brook, New York. Ms. Ives-Rublee has osteogenesis imperfecta and uses a wheelchair.

137. Because of her disability, Ms. Ives-Rublee uses a service animal who pulls her wheelchair, picks up items from the ground, pushes elevator buttons, and pushes open doors.

138. Lyft frequently denies Ms. Ives-Rublee rides because she is traveling with her service animal and/or wheelchair.

139. For example, in June 2022, a Lyft driver arrived to the pickup location and drove away once the Lyft driver could see Ms. Ives-Rublee's service animal.

140. Ms. Ives-Rublee filed a complaint with Lyft, and Lyft personnel told her that the Lyft driver was educated on Lyft's service animal policy.

141. In September 2022, Ms. Ives-Rublee requested a Lyft and when it arrived, Ms. Ives-Rublee opened the back door to enter the Lyft. Before she could enter, the Lyft driver told Ms. Ives-Rublee that pets are not allowed. When Ms. Ives-Rublee made clear that her dog is not a pet but a service dog, the Lyft driver responded, "I don't care, he is a dog," and he canceled the ride.

142. In June 2023, two Lyft drivers in a row denied Ms. Ives-Rublee service.

143. The first Lyft driver refused to take her because of her service animal. Ms. Ives-Rublee informed the Lyft driver of his obligation to accept service animals. The Lyft driver claimed he was new to Lyft and he did not know, yet he still refused her service. Below are two screenshots from a video showing: (1) the Lyft driver outside the Lyft telling Ms. Ives-Rublee he could not take her, and (2) her service animal exiting the Lyft after being denied service.

[continues on next page]





144. After waiting for a second Lyft to arrive, Lyft again denied Ms. Ives-Rublee a ride because of her service animal. Ms. Ives-Rublee explained to the Lyft driver that she had a service animal and that Lyft must provide her service, but the Lyft driver argued with Ms. Ives-Rublee, telling her that she was wrong and that she had to pay more money to travel with her service animal and reported her to Lyft for purportedly being at fault.

145. Below are screenshots from a video showing: (1) the Lyft driver yelling at Ms. Ives-Rublee out of the Lyft's passenger-side window as she waited outside the Lyft with her service animal; (2) the Lyft driver showing Ms. Ives-Rublee he filed a complaint against her with Lyft for having a dog; and (3) the Lyft driver driving away from Ms. Ives-Rublee.

[continues on next page]



146. Ms. Ives-Rublee filed a complaint with Lyft about its two drivers and submitted evidence including video evidence that showed the Lyft drivers refusing to transport her because of her service dog.

147. Despite the clear evidence that the Lyft drivers violated the ADA and Lyft's service animal policy, Lyft did not deactivate its drivers and only offered Ms. Ives-Rublee a $10 credit.

148. The Lyft representative also emailed Ms. Ives-Rublee and said, "I can assure you that we're working non-stop to take measures that'll prevent the same thing from repeating."

149. Despite this assurance, Lyft has continued to deny Ms. Ives-Rublee service because of her service dog.

150. Sometimes, Ms. Ives-Rublee does not bring her service dog with her to avoid ride denials.

151. Lyft has also discriminated against Ms. Ives-Rublee because of her wheelchair.

152. Once, Ms. Ives-Rublee requested a Lyft when she was using her wheelchair without her service dog.

153. The Lyft driver arrived, told Ms. Ives-Rublee she could not assist with stowing Ms. Ives-Rublee's wheelchair, and drove away before Ms. Ives-Rublee could tell the Lyft driver that she was able to stow her own wheelchair without the driver's assistance.

154. Because Lyft's customer service representatives ask for additional information when she files a complaint, Ms. Ives-Rublee attempts to take photographs or videos when she encounters a problem with a Lyft driver in case she needs to file a complaint.

155. Ms. Ives-Rublee's stress level increases when she requests a Lyft and she builds in time to avoid being late in case her request is denied.

156. Lyft's discrimination has left Ms. Ives-Rublee exhausted and extremely frustrated.

**Cody Leal**

157. Cody Leal lives in Austin, Texas. Mr. Leal has vision and hearing impairments caused by retinitis pigmentosa and Usher syndrome. He uses a guide dog for navigation.

158. Mr. Leal uses Lyft as his primary form of transportation to commute from work three or four days per week.

159. Because of how often Lyft's drivers refused to take his guide dog, in 2022 Mr. Leal began leaving his guide dog at home when he commutes even though he feels safer traveling with his guide dog than with a white cane—a device individuals who are blind or have low vision use to detect obstacles and navigate independently.

160. Before 2022, many Lyft drivers denied Mr. Leal rides when traveling with his guide dog.

161. In one incident, a Lyft driver told Mr. Leal something to the effect of "I'm not denying you a ride, I'm denying the dog," because he was concerned the dog would make his vehicle dirty.

162. Another time, a Lyft driver became so irate when picking up Mr. Leal because of his guide dog that Mr. Leal did not feel comfortable entering his car.

163. Now that Mr. Leal uses Lyft without his guide dog, he no longer experiences service denials due to his disability.

164. Mr. Leal was too frustrated and exhausted to file a complaint with Lyft every time he experienced discrimination.

165. When Mr. Leal did complain to Lyft, Lyft customer service representatives often responded that they issued the driver a warning and gave Mr. Leal a $5 credit, which Mr. Leal considered "a slap in the face."

166. Lyft's service denials make Mr. Leal feel anxious, frustrated, and angry.

167. Because of Lyft's service denials, Mr. Leal does not intend to get another guide dog again, even though it is more challenging and less safe for him to navigate without a guide dog.

**Yvonne Chadwick**

168. Yvonne Chadwick lives in Northville, Michigan. Ms. Chadwick is legally blind and uses a guide dog for navigation.

169. Ms. Chadwick has used Lyft several times while traveling with her guide dog and experienced denials in a majority of those cases.

170. In January 2026, Ms. Chadwick requested a Lyft to take her home from a mall in Livonia, Michigan.

171. When the Lyft arrived, Ms. Chadwick opened the door, and when the Lyft driver saw her guide dog, he indicated Ms. Chadwick needed to use Lyft's Pet rides service. Below is a screenshot from a video of Ms. Chadwick's guide dog waiting next to her outside the Lyft.



172. Ms. Chadwick explained to the Lyft driver that she was traveling with her service animal, and the Lyft driver repeated that she would need to request the Lyft service for pets (i.e., Lyft Pet rides).

173. The Lyft driver explained that he had no problem transporting pets but would only do so through Lyft's Pet rides since Lyft would pay him additional money to take pets.

174. The Lyft driver canceled the trip and asked Ms. Chadwick to close the door.

175. Ms. Chadwick filed two complaints with Lyft about her denials, but she felt Lyft never provided a satisfactory response to her complaints.

176. The Lyft denials left Ms. Chadwick feeling anxious and emotional. She felt abandoned and unsure of whether she could trust the next Lyft driver she would call.

177. As a result of her negative experiences with Lyft, Ms. Chadwick stopped using Lyft in February 2026. Ms. Chadwick would resume using Lyft if she was confident Lyft would not refuse her service while using her guide dog.

**Julie Bentley**

178. Julie Bentley lives in Sarasota, Florida. Ms. Bentley is visually impaired and uses a guide dog for navigation.

179. Lyft has denied Ms. Bentley service multiple times because of her guide dog.

180. For example, in September 2026, Ms. Bentley requested a Lyft after working out at her gym. When the Lyft driver arrived, a bystander opened the car door for Ms. Bentley and her guide dog. The Lyft driver stated that he did not accept pets, to which Ms. Bentley responded that her dog is a service animal, not a pet. The screenshot below is from a video of this incident as Ms. Bentley attempted to persuade the Lyft driver to provide her service.



181. The Lyft driver refused to transport Ms. Bentley.

182. Ms. Bentley experiences stress and anxiety when Lyft refuses to serve her.

183. Ms. Bentley still uses Lyft but avoids doing so when possible and prefers to walk for short trips because she does not want to deal with the stress of a confrontational Lyft driver denying her service.

184. Ms. Bentley takes certain steps both to avoid and document service denials, such as attempting to hide her guide dog from Lyft drivers before reaching the Lyft vehicle, asking the Lyft driver to pull into her driveway so it is harder for the Lyft driver to drive away, having a witness with her if possible, and preparing to record the service denial with her cellphone. Taking these precautions causes Ms. Bentley anxiety.

**Lynette Lijewski**

185. Lynette Lijewski lives in Minneapolis, Minnesota. Ms. Lijewski is blind and uses a guide dog for navigation.

186. Lyft has denied Ms. Lijewski service numerous times because of her guide dog.

187. For example, in March 2023, a Lyft driver began to swear and yell that he would not give Ms. Lijewski a ride when she approached the car with her guide dog. Ms. Lijewski explained that her dog was a service animal, but the driver refused to transport her.

188. Ms. Lijewski experiences stress and frustration each time she is denied a ride because she travels with a guide dog.

189. To avoid the stress and frustration of being denied service, Ms. Lijewski avoids using Lyft when possible. Instead, Ms. Lijewski often uses a more expensive private car service, which can cost about $20 more per ride than a Lyft ride would.

**Patricia Ebel**

190. Patricia Ebel lives in Secaucus, New Jersey. Ms. Ebel is legally blind and uses a guide dog for navigation.

191. Ms. Ebel uses Lyft multiple times per month to travel to work and meetings.

192. Ms. Ebel now uses Lyft's opt-in feature to notify Lyft drivers in advance that she is traveling with her guide dog. Even so, Lyft drivers continue to deny Ms. Ebel service.

193. Lyft denies service to Ms. Ebel so frequently that she sometimes has someone wait with her for her Lyft to arrive so they can assist Ms. Ebel if the Lyft driver discriminates against her.

194. In July 2025, Ms. Ebel requested a Lyft to commute home and waited for the Lyft outside with her guide dog and a coworker. Three Lyft drivers in a row denied her service because of her guide dog.

195. When the first Lyft arrived, the Lyft driver asked who had requested the Lyft. After Ms. Ebel's coworker confirmed that the Lyft was for Ms. Ebel, the Lyft driver repeatedly said, "no dogs," rolled up the Lyft's window, and drove away.

196. Two other Lyfts arrived in succession and each drove away after seeing Ms. Ebel's guide dog.

197. In one instance, the Lyft driver drove away without canceling the ride, and Lyft charged Ms. Ebel a cancellation fee.

198. Ms. Ebel's coworker could see that the Lyft drivers who denied Ms. Ebel service drove cars with the same make and model indicated on the Lyft app.

199. Ms. Ebel submitted a complaint to Lyft about the three denials. Lyft's response indicated that it was following up on only one of the rides, requiring Ms. Ebel to write to Lyft to again specify that three different Lyft drivers denied her service. Lyft did not respond further to Ms. Ebel.

200. On another occasion, Ms. Ebel scheduled a Lyft to drive her from her home to a conference in Bergen County, New Jersey.

201. When the Lyft arrived and Ms. Ebel and her guide dog reached the Lyft vehicle, the Lyft driver said, "no dogs," and denied Ms. Ebel service.

202. Because of Lyft's service denial, Ms. Ebel missed giving a presentation at the conference.

203. Ms. Ebel once missed a work meeting when two Lyft drivers in a row denied her service because she was traveling with her guide dog.

204. In another incident, a Lyft driver told Ms. Ebel to get out of the Lyft after she had entered it because the Lyft driver did not want to transport Ms. Ebel's guide dog.

205. Ms. Ebel complains to Lyft about many, but not all, of the instances of discrimination she experiences when using Lyft's service.

206. While Lyft sometimes offers a $10 credit when Ms. Ebel reports a ride denial because of her guide dog, Ms. Ebel believes this is an inadequate solution and just wants to be able to reach her destination without experiencing a service denial.

207. Ms. Ebel prefers to call Lyft to make complaints but she sometimes is unable to reach Lyft's customer service by phone, or Lyft requires her to use the Lyft app to submit a complaint.

208. Ms. Ebel tries to find alternatives to using Lyft such as relying on her husband to drive her to ensure she arrives at meetings on time and to avoid the emotional toll of Lyft's service denials or unequal service.

209. Ms. Ebel does not want to rely on her husband for transportation, however, because she wants to be independent.

210. Lyft's discrimination hurts Ms. Ebel's mental and emotional health and makes her feel beaten down. She feels embarrassed when Lyft publicly denies her service because of her disability. Ms. Ebel even questioned whether she should continue using a guide dog after retiring her last guide dog.

**Aleeha Dudley**

211. Aleeha Dudley lives in Dayton, Ohio. Ms. Dudley is blind and uses a guide dog for navigation.

212. Ms. Dudley uses Lyft to travel to medical appointments, church, and other outings. She experiences service denials multiple times a month due to the presence of her guide dog.

213. For example, in December 2025, Ms. Dudley ordered a Lyft to travel from her home to a medical appointment. When the Lyft arrived, the Lyft driver told Ms. Dudley he would not transport her with her guide dog.

214. While Ms. Dudley's hand was still holding the Lyft's door handle, the Lyft driver began to drive away, endangering Ms. Dudley and her guide dog.

215. Ms. Dudley was very shaken up after this denial, causing fear when using Lyft for subsequent rides.

216. In another instance that year, Ms. Dudley ordered a Lyft through her Medicaid provider to transport her to a therapy appointment.

217. Two Lyft drivers in a row canceled on Ms. Dudley after being informed of or seeing her guide dog, causing her to have to use her own funds to order a rideshare to her appointment rather than having it covered by her Medicaid provider.

218. Due to Lyft's denials, Ms. Dudley arrived 20 minutes late, shortening the appointment time.

219. Ms. Dudley frequently reports denials to Lyft but is seldom satisfied with their response.

**B. Lyft's Unequal Treatment of Riders with Disabilities**

220. In addition to denying service to passengers with disabilities as described above, Lyft has discriminated in other ways, including against James Rath, Virginia Prince, Elizabeth Glew, Sharon Zenger, Mia Ives-Rublee, Julie Bentley, and Patricia Ebel——as well as many other similarly situated individuals with disabilities who have used Lyft's services. Lyft's drivers argue they do not have to transport passengers' service animals, refuse to reasonably accommodate riders' disability-related needs, and in some instances speak to passengers with disabilities in disrespectful and demeaning ways because of their disabilities. Lyft asks riders questions related to their disabilities that are disrespectful or impermissible under the ADA and imposes impermissible surcharges on riders with disabilities by charging cancellation fees to riders they have unlawfully denied service.

221. Lyft provides unequal service to many passengers with disabilities because, to receive service, passengers with disabilities must educate, advocate, or persuade Lyft drivers by explaining how federal law and Lyft's policy require its drivers to transport riders with their service animals or wheelchairs.

222. For example, in November 2025, a Lyft driver arrived to transport Mr. Rath with his guide dog. However, when the Lyft driver saw the guide dog, he told Mr. Rath that he did not provide "animal" service and that if he had signed up for that service the Lyft driver would be paid $4 extra—confusing Lyft's Pet rides with his obligation to transport service animals.

223. Mr. Rath had to advocate for himself and convince the driver to provide him service. Below are screenshots from videos of Mr. Rath's guide dog waiting outside the Lyft while the Lyft driver speaks to Mr. Rath through the Lyft's open window and of Mr. Rath's guide dog sitting in the Lyft's rear footwell after Mr. Rath was able to convince the Lyft driver to take Mr. Rath and his guide dog.





224. Mr. Rath posted this experience to social media almost a year later, in September 2026. In response, Lyft commented: “We have reached out to this driver and educated him about our service animal policy.”

225. Ms. Prince has also had many instances in which she has had to beg Lyft drivers to give her a ride, including when she was with her children or in a neighborhood where she felt unsafe.

226. One Lyft driver told Ms. Ives-Rublee that her dog is “not a real service dog.” She needed to argue with the Lyft driver before the Lyft driver relented and provided her service.

227. Ms. Bentley has also had to educate Lyft drivers and persuade them to provide her service. For example, in September 2026, Ms. Bentley ordered a Lyft to pick her up at her house. When the Lyft arrived, she opened the back door and the Lyft driver stated, “Oh, you have a dog?” When Ms. Bentley responded yes, the Lyft driver stated that he did not see that in the app.

228. Ms. Bentley then spent five minutes explaining to the Lyft driver that she need not notify Lyft that she is traveling with a service animal in advance despite the Lyft driver’s repeated insistence that she must. The Lyft driver eventually relented and agreed to take her.

229. Ms. Ebel has had to argue with Lyft drivers about her right to travel with her guide dog. Sometimes Lyft drivers then reluctantly agree to provide Ms. Ebel service, but it makes the ride awkward and uncomfortable.

230. Similarly, Ms. Prince has had Lyft drivers reluctantly agree to transport her and her guide dog, but the Lyft drivers are then angry and some drive erratically during the ride.

231. Lyft subjects other passengers with disabilities to unwanted comments or disrespectful and demeaning questions based on their disability.

232. For example, a Lyft driver agreed to transport Ms. Glew and her service dog, but told Ms. Glew that she does not like dogs.

233. When filing complaints with Lyft in the past, Ms. Zenger sent screenshots to support her complaints because many of Lyft's customer service representatives questioned her accounts because of her blindness.

234. Lyft also improperly charges cancellation fees after unlawfully denying service to passengers with disabilities, including Ms. Zenger and Ms. Ebel. Lyft only reverses these charges after the passengers complain to Lyft and provide information about the ride.

235. Lyft has also threatened passengers with disabilities, including Ms. Zenger, with deactivation after Lyft drivers gave them poor feedback following incidents in which the Lyft driver discriminated against them.

**C. <u>Lyft's Failure to Make Reasonable Modifications</u>**

236. Lyft's drivers have refused to make reasonable modifications to their usual practices to avoid discrimination against riders with disabilities.

237. Lyft drivers' failure to make reasonable modifications to their practices have harmed Sharon Zenger and Lisa Harris, as well as other similarly situated individuals with disabilities who have used Lyft's services.

238. For example, Sharon Zenger sends a message to Lyft drivers through the app to notify them that she is deaf-blind and asks them to call out her name after arriving at the pickup location. Lyft drivers frequently fail to comply with this request, making it more difficult for her to locate the correct vehicle.

**Lisa Harris**

239. Lisa Harris lives in Oklahoma City, Oklahoma. Ms. Harris has neuropathy in her feet, which substantially limits one or more major life activities, including balance.

240. In June 2026, Ms. Harris requested a Lyft to take her to a physical therapy appointment.

241. Ms. Harris specified through the Lyft app that she has a disability and needs to sit in the front passenger seat.

242. Ms. Harris requests this reasonable modification when using Lyft because when getting into the front seat there is more room to maneuver and she can hold onto the frame of the car, which reduces her risk of falling.

243. When the Lyft arrived, Ms. Harris opened the front door and saw that there were items on the front seat.

244. Ms. Harris apologized to the Lyft driver and explained that she has a disability and is a fall risk so it is not safe for her to get into the backseat.

245. The Lyft driver replied that Ms. Harris would be more comfortable in the backseat.

246. Ms. Harris explained again that she is a fall risk and could not use the backseat. She said she would report the Lyft driver for denying a reasonable modification for her disability.

247. Ms. Harris called Lyft to complain but did not receive further communication from Lyft about her complaint.

248. Ms. Harris is very upset and frustrated by Lyft's discrimination against her due to her disability.

**D. <u>Lyft's Failure to Prevent or Correct Disability Discrimination</u>**

249. All the above discriminatory conduct flows directly from and is exacerbated by Lyft's broader failures to prevent discrimination against individuals with disabilities or provide meaningful relief to those it harms.

250. Lyft has notice of the widespread disability-based discrimination in its transportation services but has failed to prevent it.

251. Lyft does not adequately train its drivers or customer service representatives about their ADA obligations, including how to properly and respectfully assist and treat individuals with disabilities who use Lyft's transportation service in a respectful and courteous way.

252. Lyft does not adequately monitor its drivers to prevent disability-based discrimination or take appropriate corrective actions when drivers discriminate.

253. Lyft does not independently review and verify that it has not improperly charged riders cancellation fees because the riders use service animals or mobility devices or for other disability-related reasons unless a complaint is filed.

254. Nor does Lyft adequately address and remedy complaints of discrimination by, for example, removing drivers who discriminate from its platform or by otherwise effectively penalizing or training those drivers to ensure they do not discriminate in the future.

255. Instead, as detailed above, Lyft regularly provides "relief" to complainants that does not adequately compensate them for the harm they have suffered.

256. This includes, for example, the $10 credit that Lyft offered to Judge Tatel after a Lyft driver screamed at Judge Tatel, his wife, and his service animal and refused to give them a ride. Judge Tatel wanted Lyft to change its procedures rather than give him a credit.

257. Lyft charged Ms. Zenger a cancellation fee for being a "no show" after her Lyft driver refused her service because of her guide dog and then the Lyft driver waited down the road without canceling the ride. This required Ms. Zenger to complain to Lyft to obtain a refund.

258. Lyft offered a $5 credit to Mr. Leal after its discriminatory denials of service, which he felt did not adequately compensate for the time Mr. Leal wasted because of a ride denial and the anxiety, frustration, and anger caused.

259. Lyft also gave Ms. Ives-Rublee a $10 credit and did not deactivate its drivers even after she complained to Lyft and submitted clear evidence that the Lyft drivers violated the ADA.

260. Lyft's complaint "resolution" also includes instructing passengers, including Jodie Simon, that they will no longer be matched with Lyft drivers who have discriminated against them, which limits the pool of potential Lyft drivers for that passenger and does not prevent that Lyft driver from discriminating against other passengers with disabilities.

261. Riders whom Lyft frequently discriminates against have the harm compounded by the fact that they must file complaints with Lyft, which takes time and energy.

262. Many riders with disabilities do not bother filing complaints against Lyft each time they are discriminated against because they so rarely get a meaningful response and have not experienced an improvement in service or cessation of discrimination.

263. Lyft's customer service representatives have also asked questions about a rider's disability that are not permitted under the ADA.

**E. Lyft's Discrimination Significantly Harms People with Disabilities**

264. In addition to the harms described above, Lyft's discriminatory conduct has negatively affected people with disabilities who use or try to use Lyft's services in other ways.

265. Lyft's service denials are frustrating, demeaning, stressful, and time consuming. They often put passengers in embarrassing positions in front of others, including family members and colleagues.

266. Lyft's failure to train its drivers places the burden and stress on riders with disabilities to try to educate Lyft drivers.

267. Lyft's service denials harm people with disabilities by causing them to be late for or miss important obligations such as work and medical appointments.

268. Lyft also harms people with disabilities through its denials of service and unequal treatment by failing to implement effective processes for remedying its own discriminatory conduct.

269. To avoid denials and negative interactions with Lyft's drivers and representatives, many people with disabilities take precautionary steps that cost them time, effort, and money, and that make them feel less comfortable, safe, and independent.

270. Passengers with disabilities often build in extra travel time because they expect Lyft's drivers to deny or cancel their rides.

271. They take on the burden of trying to document their Lyft trips using screenshots, audio or video recordings, or other means, so that they have proof of any discrimination allegations they may need to make later.

272. Some passengers who travel with service animals pay extra for alternative transportation to avoid ride denials and negative interactions with Lyft drivers.

273. Other passengers leave their service animals at home to avoid ride denials. These passengers do not feel as comfortable or safe without their service animals. These customers also must forego the intended utility and protection that the service animals provide them.

274. Other passengers against whom Lyft has discriminated because of their disabilities have deactivated their accounts or stopped requesting Lyft rides whenever possible to avoid feeling humiliated, embarrassed, or unsafe.

275. These passengers instead rely on less convenient options for travel, including walking, public transit, or rides from family.

276. Some passengers continue to rely on Lyft despite the challenges and harms they suffer from Lyft's discriminatory conduct because there is no other viable transportation option for them to travel to work or other commitments.

## VI. CAUSE OF ACTION

### A. Violation of Title III of the Americans with Disabilities Act

277. The United States re-alleges and incorporates by reference the allegations set forth in the preceding paragraphs.

278. Lyft has discriminated against individuals with disabilities, in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37, through its policies and practices of denying or providing unequal services to individuals with disabilities, including individuals with service animals or individuals who use stowable wheelchairs or mobility devices.

279. Lyft's violations of the ADA amount to a pattern or practice of discrimination.

280. Lyft's discrimination against individuals with disabilities under the ADA raises an issue of general public importance.

281. Lyft's discrimination includes:

a. Denying full and equal access to individuals with disabilities in violation of 42 U.S.C. § 12184(a); *see also* 49 C.F.R. § 37.5(f);

b. Denying individuals with disabilities the opportunity to use Lyft's transportation service, if they are capable of using that service, 49 C.F.R. §§ 37.5(b), 37.29(c); *see also* 42 U.S.C. § 12184(b)(1), (2);

c. Refusing to permit service animals to accompany individuals with disabilities in vehicles, in violation of 49 C.F.R. § 37.167(d); *see also* 42 U.S.C. § 12184(a);

d. Denying equal service or assistance to individuals with disabilities, including assistance with stowing mobility devices when needed, in violation of 49 C.F.R. § 37.29(c); *see also* 42 U.S.C. § 12184(a);

e. Imposing higher fees and unnecessary surcharges on individuals with disabilities including those who travel with service animals or mobility devices, in violation of 49 C.F.R. §§ 37.5(d), 37.29(c);

f. Failing to ensure that personnel are trained to proficiency, as appropriate to their duties, so that they can properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, 49 C.F.R. § 37.173; *see also* 42 U.S.C. § 12184(a);

g. Failing to adopt complaint procedures that provide for the prompt and equitable resolution of complaints alleging disability discrimination, including prompt communication of the entity's response and reasoning for its response to each complainant, 49 C.F.R. § 37.17(b); *see also* 42 U.S.C. § 12184(a); and

h. Refusing to make reasonable modifications to its policies, practices, and procedures necessary to avoid discrimination. *See* 42 U.S.C. § 12184(b)(2)(A); 49 C.F.R. § 37.5(f); *see also* 42 U.S.C. § 12184(a) and 28 C.F.R. § 36.302 (incorporated by reference in 49 C.F.R. § 37.5(f)).

282. Lyft's violations of the ADA have harmed and continue to harm individuals with disabilities who, because of Lyft's discrimination, are entitled to monetary damages, including compensatory and emotional distress damages. 42 U.S.C. § 12188.

[continues on next page]

## VII. PRAYER FOR RELIEF

Plaintiff United States prays this Court:

A. Grant judgment for the United States and declare that Lyft's actions, policies, and practices, as alleged in this complaint, violate Title III of the ADA, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

B. Enjoin Lyft, its officers, agents, employees, drivers, and all others in concert or in participation with it, from discriminating against individuals with disabilities, and failing to comply with Title III of the ADA, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

C. Order Lyft to modify its policies, practices, and procedures to comply with Title III of the ADA, 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

D. Order Lyft to provide ADA training to its officers, agents, employees, drivers, and all others in concert or in participation with it to a proficient level to meet ADA requirements;

E. Award monetary damages, including compensatory damages for emotional distress, pain and suffering, and other injuries, to persons aggrieved by Lyft's actions or failures to act, pursuant to 42 U.S.C. §§ 12181–89, and its implementing regulation, 49 C.F.R. pt. 37;

F. Assess a civil penalty against Lyft pursuant to 42 U.S.C. § 12188(b)(2)(C), to vindicate the public interest; and

G. Order such other appropriate relief as the interests of justice may require, together with the United States' costs and disbursements in this action.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury as to all issues.

[continues with signatures on next page]

Respectfully submitted this 9th day of November, 2026

CRAIG H. MISSAKIAN
United States Attorney
Northern District of California

/s/ Savith Iyengar
SAVITH IYENGAR
Assistant United States Attorney
Civil Division

JESUS A. OSETE
Acting Assistant Attorney General
Civil Rights Division

R. JONAS GEISSLER
Deputy Assistant Attorney General
Civil Rights Division

/s/ Katherine Dutcher
LUIS PEREZ
Director
KEVIN J. KIJEWSKI
Deputy Chief
KATHERINE DUTCHER
JANE E. ANDERSEN
DAVID W. KNIGHT
JAMES FLETCHER
Trial Attorneys
Disability Rights Section
Civil Rights Division
U.S. Department of Justice